UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

**WIFILAND, LLP**                                                                                                               **PLAINTIFF**

**V.**                                    **3:11-CV-01315-BRW**

**R.V.C., INC. D/B/A:**
**RIVER VIEW CAMPGROUND**
**AND CANOE LIVERY**                                                                              **DEFENDANT**

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Wifiland, LLP ("Plaintiff") provides wireless high-speed internet access to recreational vehicle parks and campgrounds. River View Campground ("Defendant") is a recreational vehicle park and campground in northern Michigan. Mr. John Borg, CEO and founder of Wifiland, LLP, and Mr. Golebiewski, vice president of River View Campground, signed the disputed contract (a "license agreement") and they are the protagonists in the case; both were present for a day and a half bench trial that began on February 25, 2013. When Plaintiff rested, I found for Defendant under Federal Rule of Civil Procedure 52(c).

Below are my findings of fact and conclusions of law.

### I.      BACKGROUND

####       A.      License Agreement

On March 19, 2010, the parties entered into a seven-year "license agreement" that gave Plaintiff a license "for the use of antenna and equipment space" at various locations on Defendant's property so there would be property-wide wireless internet access for patrons. Defendant chose two specific plans under the contract -- Options A and D. Option A set out the revenue sharing arrangement between the parties. Option D was a do-it-yourself option, that

obligated Defendant to install the wireless equipment under Plaintiff's guidance. In return, Defendant would receive a discount on the cost of the services. Option D also provided:

> [Plaintiff] will do an on site survey and training to teach [Defendant] what is required to do the installation on their own. [Plaintiff] will show where the structures need to be and provide remote installation and configuration support during the turn up process. All finished work must be photo documented by [Defendant] and delivered to [Plaintiff] prior to a final sign off.[1]

Plaintiff went to Defendant's property for one day in early April 2010, surveyed the area, provided training, and "roughed in two nodes."[2] Throughout April, Defendant installed the equipment under Plaintiff's remote supervision (the parties primarily corresponded through email and telephone after Plaintiff's first and only visit to the property). The installation progressed faster than expected.[3]

As required by the contract, Defendant sent pictures of his progress. For example, in an April 9 email, Plaintiff referenced a video of some of the equipment that had been provided by Defendant. On April 16, 2010, Defendant sent Plaintiff photos of wiring for a tower in order to get Plaintiff's feedback before installing additional towers.[4] Five days later, Defendant emailed a video "showing the wiring of R5," which is a station in the network.[5] And on May 6, Defendant provided Plaintiff with additional photos of the various towers, which Plaintiff said "look[ed] pretty good,"[6] though he pointed out a few concerns. On May 17, Defendant provided

---

[1] Plaintiff's Exhibit ("PX") 1.

[2] PX 3. Nodes are "points of presence of equipment at the property." There were 10 nodes at Defendant's property and they were labeled R0 through R9.

[3] PX 28 -- Plaintiff bragged on Defendant's progress, "You're cruising on setup dude!"

[4] Defendant's Exhibit ("DX") 39.

[5] DX 68.

[6] PX 39.

2

Plaintiff with "a bunch of photos of the install" except for one station, which was not yet mounted in its permanent location.[7] Plaintiff commented that the photos and work were "WELL DONE."[8]

### B. Network Instability

From early April into early May, Defendant installed the system, while getting feedback from Plaintiff.[9] The system had connection and power problems during the installation, but the parties worked together to resolve the problems.[10] On May 4, 2010, Plaintiff commented that the system was "[a]ll in good order still" but two nodes were not in their final locations.[11]

During the morning of May 5, 2010, there were problems with the network again and Defendant complained about the instability of the system.[12] Plaintiff considered the potential causes, and suggested that another weekend of use would help eliminate the potential causes of the system's instability.[13] By May 6, 2010, Defendant noted that the "major [installation] work" was complete and all that was left was tree trimming.[14]

For the next ten days, the system continued to have random outages and Defendant suggested that "one of [Plaintiff's] techs . . . come out and inspect our setup and see what is

---

[7]DX 109.

[8]PX 46 (emphasis in original).

[9]See PX 24 through 29.

[10]See PX 30 through 37.

[11]PX 37.

[12]PX 38.

[13]Id.

[14]PX 39.

3

really going on."[15]  Defendant complained: "These service disruptions are not acceptable. Whether my installation methods are flawed, or there is an issue with equipment or some other mysterious reasoning behind this, we need to get it solved."[16]  Plaintiff acknowledged that the instability was "a mystery."[17]  Network problems persisted from May 22 through May 25.[18]  Plaintiff did not send a technician to the property.

    C.    "Come Get Your Gear"

The next correspondence between the parties (in the record)[19] is on June 19, 2010, when, after Defendant did a reboot, the network was working as it should.[20]  Yet, on June 20, parts of the system went down again.[21]

The morning of June 25, part of the network "went out" and Plaintiff requested reboots. Since the system needed no reboots all week long, Plaintiff thought a user might have been abusing bandwidth.[22]  Plaintiff also opined that the issue could be wiring and suggested that Defendant rebuild R7.[23]  On June 26 part of the system was down yet again.  However, Plaintiff noted that R1 (the unit connected to the CAT 5 wire) was "more stable lately," which was "oddly

---

[15]PX 41.

[16]*Id.*

[17]PX. 43.

[18]PX 44 through 47.

[19]Based on Defendant's exhibit list, correspondence continued between the parties from May 25 until June 19, 2010; however, these emails are not in the record.

[20]PX 60 -- "That is the way things are supposed to be -- wonderful."

[21]PX 61.

[22]PX 63.

[23]*Id.*

4

inconsistent" if no changes had been made.[24]  With the unexplained outages continuing, Defendant responded:

> How much longer are we going to grasp at straws before you send a tech and figure out what is going on here?
>
> I'll rewire this R7 panel, but that is the last station I am servicing for you.
>
> If I was a freelance tech for you, after my initial install, I would have been long gone and you would have sent a tech out.
>
> You should treat my property the same as others.
>
> I'll be back in town on Monday and work will be completed then.[25]

Plaintiff responded that a technician would not be sent out until it was clear that the problems were not because of Defendant's installation.  Plaintiff also noted that Defendant could "walk away from [the] self install option at any point but the costs likely will be higher for [Defendant] than just doing the rebuilds as [Plaintiff] request[ed]."[26]  Defendant told Plaintiff, "Come get your gear."  In reply, Plaintiff emailed "This your final decision?  I'll only ask once.  As I said, this is a business decision on our end and emotional one on yours."[27]  Defendant recanted, "I'm going to review the wording of our contract and be in touch this week."[28]

That same day Plaintiff's internal notes indicated the need for "more rigorous documentation," and that the "system is operational, stable, and has been with the exception of a station or two . . . ."[29]

---

[24]PX 64.

[25]PX 65.

[26]*Id.*

[27]*Id.*

[28]PX 65.

[29]PX 67.

In a letter dated June 28, 2010, Plaintiff told Defendant that he was "in material breach of the License Agreement . . . for failure to complete the installation as prescribed."[30] Plaintiff claimed $27,743.91 in damages because of the "lack of finishing the installation" of the network and gave Defendant 15 days to "substantively respond to the Notice of Breach."[31] If Defendant did not cure the issues, Plaintiff would "pursue its legal rights and remedies through trial," where the prevailing party would be entitled to "reasonable attorney's fees and costs."[32]

Having not yet received Plaintiff's letter, on Tuesday, June 29, 2010, Defendant notified Plaintiff that he had reviewed the agreement and believed he had upheld his portion of the installation. Defendant noted that the "agreement was for self-installation, not installation and maintenance."[33] Noting that the system worked but continued to have problems, Defendant again suggested that Plaintiff send a technician "familiar with all aspects of [the] gear" to the property. Defendant agreed to rewire R7 and run an above-ground CAT 5, but if problems remained, an on-site technician would be necessary. If Plaintiff responded to this email, it is not in the record.

On July 1, 2010, Defendant received the Notice of Breach letter, and emailed Plaintiff. Defendant disputed Plaintiff's assessment of the situation, and suggested a compromise. Again, Defendant agreed to rewire R7 and run a new CAT 5 -- the "only outstanding issues . . . on the docket."[34] That afternoon Plaintiff responded and seemed amenable. But, Plaintiff noted that

---

[30]PX 59.

[31]*Id.*

[32]*Id.*

[33]PX 50.

[34]PX 51.

6

now "[l]egal has their nose in this . . . and of course engineering has been advised to back off until the work efforts have been done as prescribed."[35] He advised Defendant that the 15 day period to remedy was not "flexible" because of legal's involvement.[36]

Defendant was "surprised legal [was] involved" since the agreement required the parties to "resolve any problems in an informal manner."[37] Defendant reiterated that he had fully installed the gear and that the problems were a maintenance issue that were Plaintiff's obligation. Again Defendant agreed to rewire R7 and run a new CAT 5, but only if Plaintiff would "agree to send a technician to troubleshoot if problems remain . . . ."[38]

Plaintiff retorted that the install was not complete because engineering had not yet signed-off on the installation, and rejected Defendant's request that a technician be sent if problems remained after the corrections. Plaintiff reminded Defendant that "in-house legal council [sic] has been engaged if things go awry or don't move along in a timely fashion."[39]

On July 3, 2010, Defendant countered that he would like to take Plaintiff up on his offer to opt-out of the self install, and Defendant set out his terms.[40] Plaintiff advised that he would "put in [Defendant's] request" but he was not the final decision maker.[41] He also mentioned that Defendant would have to compensate him for ongoing losses. In an attempt at a "good faith . . . compromise" Defendant waived his request for discounts on already installed towers and agreed

---

[35]*Id.*

[36]*Id.*

[37]*Id.*

[38]*Id.*

[39]*Id.*

[40]*Id.*

[41]PX 52.

to forego proceeds from the revenue sharing agreement. Defendant also offered to supply a technician with whatever he would need to remedy the issues at the property.

Six days later, after prompting by Defendant, Plaintiff rejected Defendant's offer.[42] Plaintiff advised that "nothing changes on our end as I've run out of options to help."[43] Plaintiff reminded Defendant that he needed to rewire one node and "shorten [the] CAT 5 run."[44] Plaintiff also wrote: "With legal holding the ball over here it's serious and there won't be further banter. If your time line is missed, a marshal will show up to serve the complaint as the next move! . . . Damages are growing so swift resolution is in your favor."[45]

Defendant responded, "So are you recalling your offer to opt out of the self install plan? I've attempted to compromise, but you aren't willing to move an inch."[46] Plaintiff said he was "merely a messenger" and that financial and legal were now in control. He then pointed out all the logistical and financial reasons that Defendant should not opt-out of the self install.[47]

On July 9, 2010, Defendant indicated that the parties appeared to be "at an impasse," since Plaintiff had "recanted the offer . . . for opting out of the self install option."[48] Defendant

---

[42] PX 54.

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] PX 53.

[48] *Id.*

noted that Plaintiff had "failed to compromise on any issue,"[49] and told him to come get his equipment.[50]

Plaintiff sent Defendant an invoice dated July 15, 2010.[51]  After Defendant advised that he would not pay until the network issues were resolved, there is no more communication between the parties in the record.[52]

Plaintiff commenced this lawsuit in Connecticut state court on August 18, 2010.[53]  Defendant removed to federal court on August 17, 2011.

## II.   DISCUSSION

Plaintiff asserts that Defendant breached the contract by failing to complete the do-it-yourself installation and by not "render[ing] payments due [Plaintiff] pursuant to the Agreement."[54]  Plaintiff also contends that Defendant violated the implied covenant of good faith and fair dealing when "in multiple bad faith attempts to circumvent its obligations" under the agreement, Defendant "refused to install the network in accordance with its obligations under the Agreement."[55]  Neither of these claims is supported by the evidence.

---

[49] *Id.*

[50] PX 55.

[51] PX 56.  Plaintiff sent Defendant an initial invoice dated June 15, 2010, for $1,940.00. (PX 48).  However, in a June 29, 2010 email, Defendant commented that he was "surprised when I received your last invoice as we agreed to hold off on this until the system was stable.  I have no problem finalizing payment once the network is stable." (PX 50).

[52] PX 57.

[53] Doc. No. 1.

[54] Doc. No. 61.

[55] Doc. No. 61.

**A.     Breach**

Plaintiff argues that Defendant breached the contract by not finishing the installation of the network and by refusing to pay an invoice.

First, Plaintiff did not prove that Defendant did not finish the installation. In fact, during trial, Plaintiff admitted the network was "fully operational" and all the equipment was hooked up. Clearly, the equipment was installed, since Plaintiff's requests were for a "rebuild" and a "rewire" -- both of which suggest that the node was built or wired at least once before. So, the issue wasn't whether the equipment was installed, but whether it was working properly. Defendant did all that could have been reasonably expected of him, under the contract, toward completing installation. The fact that Plaintiff never "signed off" on the installation is of no consequence. The issues could have been resolved if Plaintiff or a competent technician had gone to the property and checked on the equipment. If it was not properly installed, then Plaintiff could have requested reimbursement and the parties could have continued to operate under the contract.

Second, Plaintiff jumped the gun when it came to getting "legal involved." Paragraph 27 of the agreement reads:

> As a precondition to commencing any legal action to enforce this Agreement or to seek damages for a breach thereof, the parties agree they will <u>endeavor in good faith to informally resolve such suit.</u>[56]

Good faith endeavors are "honest and sincere efforts to engage in discussions and pursue reasonable possibilities to resolve the matters in dispute, with the parties taking into consideration their own respective needs, requirements, and legal obligations."[57]

---

[56]PX 1 (emphasis added).

[57]*Elliott v. Staron*, 735 A.3d 902, 909 (Conn. Super. 1997).

It is undisputed that the network was unstable, but the cause was unknown. After months of wiring, rewiring, troubleshooting, and rejected requests for a technician's review, Defendant was fed up. Plaintiff reminded Defendant that he could "walk away from [the] self install option at any point" but noted that it would be expensive for Defendant. Defendant snapped and said "come get your gear." However, just over an hour later, Defendant recanted, and said he would like time to review the contract and touch base with Plaintiff later in the week. Before hearing back from Defendant, Plaintiff precipitously issued a Notice of Breach letter, which alleged that Defendant failed to complete the installation of the system and threatened legal action if the issue was not remedied within 15 days.[58] After reviewing the contract, but before receiving Plaintiff's Notice of Breach letter, Defendant again voiced his complaints but agreed to one last effort to troubleshoot the issues. Specifically, Defendant agreed to re-wire R7 and the CAT 5 line, but, again, requested that a technician come to the property if the issues were not resolved.[59]

After receiving Plaintiff's Notice of Breach letter, the relationship became strained, but Defendant continued with his offer to fix the two remaining issues, so long as a technician would come out if reliability problems continued. Rather than agree to Defendant's proposal (which would be the reasonable, good faith solution to the problem), Plaintiff gave him the run-around. Plaintiff suddenly claimed that he had no decision making power -- though he was the CEO -- and noted that now all decisions had to go through legal. I believe that Plaintiff's claim that he had no decision making power was a makeweight intended to add pressure on Defendant. Again, Defendant asked if Plaintiff would agree to send a technician after Defendant rewired R7 and checked the CAT 5 run. Plaintiff declared, "we won't abide by those terms nor under these

---

[58]PX 59.

[59]PX 50

11

circumstances will a renegotiation be entertained . . . it's in your best economic interest to finish this yourself."[60]  He again reminded Defendant that "in house" counsel had been "engaged."[61]

Defendant again tried a compromise by taking up Plaintiff on his offer to "opt out of the self install" and take on additional costs.  Rather than accept the offer, again, Plaintiff pointed the finger at engineering and legal.  Six days later, Plaintiff rejected Defendant's request to opt out of the self install.  Plaintiff informed Defendant of the two outstanding issues, that nothing had changed from Plaintiff's perspective, and that damages were growing.  Plaintiff threatened "[i]f your time line is missed, a marshal will show up to serve the complaint as the next move! . . . Damages are growing so swift resolution is in your favor."[62]  When Defendant asked for clarification as to whether the opt out offer had been revoked, Plaintiff again gave Defendant the run-around,[63] and reiterated that the "clock was ticking."

Every step of the way -- whether it was troubleshooting and rewiring the equipment or negotiating a resolution over the disagreement of terms -- Defendant made a good faith effort to compromise.  On the other hand, Plaintiff shirked any responsibility, was unwavering in his position, and continued to threaten legal action -- all directly in violation of Paragraph 27 of the agreement.

What still baffles me is Plaintiff's repeated refusal to send a technician as requested.  This approach likely would have resolved the problems efficiently and at much less costs for all involved.  Notably, Plaintiff finally did send a technician to the property, but it was a year after

---

[60]PX 51.

[61]*Id.*

[62]*Id.*

[63]PX 53 -- "I'm merely a messenger at this point for a lot of reasons, financial and legal mostly but the board watches this stuff closely and I want to keep my job!"

12

commencing litigation and in an investigative capacity, rather than an attempt to fix the system's problems.

B.  **Implied Covenant of Good Faith and Fair Dealing**

As for the breach of the implied covenant of good faith and fair dealing, Plaintiff failed to establish "fraud, misrepresentation, or improper motive," which is required under Connecticut law.[64]  Based on the evidence, from early April until the end of June, Defendant cooperated with Plaintiff during the installation of the network.  He repeatedly sent pictures, sought feedback, made changes at Plaintiff's request, and the "major installation" work was completed as early as May 5.  And, during trial Plaintiff admitted that the equipment was "fully operational" by the time the parties were at loggerheads over who was obligated to remedy the ongoing reliability issues.

Despite Plaintiff's protests that the system was not "fully installed," the claim is unsupported.  While it is clear that the system was not stable, the only outstanding issues were a "rebuild" of R7 and a check of the CAT 5 wire going to R1.[65]  Plaintiff did not dispute this fact when he responded to Defendant's email, nor did he dispute it in trial.  The only evidence to the contrary was Plaintiff's testimony that a piece of equipment was disconnected in a shed, but this comment was based on a technician's review (which was not admitted into evidence) of the property nearly a year after Plaintiff sued Defendant.  This fails to establish that the equipment was never installed -- it just was not installed in July 2011.  As for the other findings in the

---

[64]*Miller Auto. Corp. v. Jaguar Land Rover North America, LLC.*, 471 Fed. Appx. 37, 40 (2d Cir. 2012).

[65]PX 51 (Defendant wrote, "I've offered to rewire R7, and perform the new CAT 5 run.  To my recollection, these are the only outstanding issues that are on the docket.").

13

technician's report, even if it had been admitted into evidence, all were issues that could have been easily resolved had Plaintiff been willing to send a technician to the property a year earlier.

### C. Plaintiff's Damages Analysis

Defendant vigorously attacks Plaintiff's proof on damages; but since I have ruled against Plaintiff on liability, I need not reach the issue of damages.

As for the outstanding invoice of $1,940.00, Defendant is not responsible for payment. Defendant's June 29, 2010, email reads, in part: "I was surprised when I received your last invoice as we agreed to hold off on this until the system was stable."[66]  Plaintiff did not dispute this statement. Since the system was never "stable" Defendant is not obligated to pay the outstanding invoice.

### CONCLUSION

Based on the findings of fact and conclusions of law mentioned at the close of Plaintiff's case on Wednesday, February 27, 2013, and outlined in this Order, judgment is entered for Defendant and this case is DISMISSED with prejudice.

Defendant's request for attorneys' fees and costs must be filed by 5 p.m., Monday, March 18, 2013, as was previously agreed to by the parties.

Additionally, within thirty days of the date of this order, Plaintiff should remove its equipment from Defendant's property, unless the parties can work out an agreement for Defendant to obtain the equipment.

IT IS SO ORDERED this 15th day of March, 2013.

/s/ Billy Roy Wilson
UNITED STATES DISTRICT JUDGE

---

[66]PX 49.